FLORENCE CATALANOTTO, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF THOMAS J. CATALANOTTO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Catalanotto v. Commissioner
Docket No. 10182-79.
United States Tax Court
T.C. Memo 1984-215; 1984 Tax Ct. Memo LEXIS 453; 47 T.C.M. (CCH) 1665; T.C.M. (RIA) 84215; April 25, 1984. Michael S. Fawer,Matthew H. Greenbaum,Chris M. Evans, and Herbert V. *454 Larson, Jr., for the petitioners. H. Karl Zeswitz, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in and additions to the Federal income taxes of petitioner and her deceased husband as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b), I.R.C. 1954
1972
$ 4,967.10
$2,483.55
1973
10,751.20
5,375.60
The issues for decision are: (1) Whether respondent properly determined, pursuant to the net worth plus personal expenditures method of income reconstruction, that petitioner and her deceased husband underreported their taxable income by $19,690.71 for 1972 and by $35,975.29 for 1973; and (2) Whether, if we find that such income was underreported, any part of the resultant underpayment of taxes for either 1972 or 1973 was due to fraud on the part of Thomas J. Catalanotto, petitioner's deceased husband. FINDINGS OF FACT At the time they filed their petition in this case, petitioners were Thomas J. Catalanotto and Florence Catalanotto; they maintained their legal residence in New Orleans, Louisiana. Thomas J. Catalanotto died on January 15, 1983; *455 his estate succeeds him as a petitioner in this case. For the sake of simplicity, however, we shall hereinafter refer to Thomas J. Catalanotto as petitioner; Florence Catalanotto is a petitioner herein only by virtue of having filed joint returns with her deceased husband. During 1972 and 1973, the years at issue, petitioner owned and operated a bar, the Golden Coin Lounge (Golden Coin), located at 3655 18th Street, Metairie, Louisiana. The bar is located in an area known as "Fat City." Petitioner opened the Golden Coin for business beginning in 1968; however, he had been involved in the bar business since the late 1940's as the owner-operator of the following bars in the New Orleans area: Bar Name
Address
Years of Operation
The Hot Spot
South Rampart
1947 - 1950
Green Room
Orleans Avenue
1950 - 1952
Tony's Green Room
St. Peters
1952 - 1958
Tony's Green Room
North Galvez
1958 - 1968
In addition to his business at the Golden Coin, petitioner also owned and received rental income during 1972 and 1973 from the following properties: 3655 18th Street, Metairie, Louisiana: downstairs portion used for restaurant purposes; upstairs portion used as apartments; *456 6409-11 Marshall Foch Street, New Orleans, Louisiana: residential duplex; 400 North Galvez Street, New Orleans, Louisiana: use unspecified. 1. Operation of the Golden Coin
The Golden Coin was a bar at which only drinks, no food, were served.It was run by petitioner as a strictly cash operation in that customers were allowed to pay for their drinks with cash only. Petitioner employed bartenders and waitresses to help him operate the bar; however, petitioner alone controlled all business aspects of the Golden Coin, such as ordering supplies and paying the bills. Petitioner was described by several former employees of the Golden Coin as an astute, strict businessman who "ran a tight ship." At the end of each of the Golden Coin's two nightly shifts, at 8:00 p.m. and again at closing at 4:00 a.m., petitioner rang out the cash register. After ringing out the cash register, petitioner took the cash drawer, along with the cash register tapes and guest receipt tickets which itemized the type and amount of drink sales made during each shift, into his office/storeroom at the Golden Coin. There, alone and with the office door closed, petitioner balanced the cash drawer and totalled *457 the cash receipts for each shift, requiring the bartender to make up any cash shortages that he discovered. Petitioner took the daily cash receipts from the Golden Coin to his home and put them in a drawer in his bedroom. Every Monday, he would determine how much he needed to pay his business expenses for the week and only that amount did petitioner deposit into his business checking account at the Bank of Louisiana, the only account into which he deposited business receipts from the Golden Coin. With respect to personal expenses, each Sunday, petitioner removed $140 from the Golden Coin cash register and gave it to his wife for household expenses. Likewise, petitioner removed $10 each Sunday from the register for his son's allowance, and $25 for his own personal use.
2. Petitioner's Bookkeeping System and Income Tax Return Preparation
For bookkeeping purposes, petitioner maintained what is referred to as a "bag account" which was the bookkeeping system set up for him by Roy Bourgeois (Bourgeois), whose firm, Accurate Accounting Service, Inc. (Accurate Accounting), was retained by petitioner to prepare his Federal income tax returns. Pursuant to this system, petitioner *458 entered a sum purporting to be the Golden Coin's daily gross cash receipts onto the appropriate space on a recap sheet which was numbered 1 through 30 or 31 and reflected cash receipt totals for each day of each month. At the end of each month, petitioner would bring to Accurate Accounting the monthly recap sheet along with an envelope containing invoices and receipts for all of his business expenses incurred during the month. Based solely on this information supplied by petitioner, i.e., the monthly recap sheets prepared by petitioner and the expense receipts placed in the envelope by petitioner, employees of Accurate Accounting prepared petitioner's Federal income tax returns for the years at issue. After the income tax returns were prepared by Accurate Accounting, petitioner reviewed the returns along with his wife; they signed the returns and mailed the returns themselves. Petitioner was specifically instructed by his accountant, Bourgeois, to retain his cash register tapes in order to substantiate his business receipts. After making the daily cash receipt entries onto the recap sheet, however, petitioner did not retain any documentation of daily lounge sales; rather, *459 petitioner disposed of the cash register tapes and guest receipt tickets. The discarded tapes and receipts were ultimately removed from the premises of the Golden Coin in the trash. For the year 1972, petitioner pleaded guilty to the criminal charge of willfully failing to keep records, specifically "cash register tapes", in violation of section 7203. [1]
For the years at issue, 1972 and 1973, petitioner and his wife timely filed joint Federal income tax returns in which they reported taxable income of $4,550.52 for 1972 and $1,053.38 for 1973. These returns were prepared by Kieren "Buddy" Bloecher (Bloecher), an employee of Accurate Accounting, based on the information supplied solely by petitioner. 3. Examination of Petitioner's 1972 and 1973 Federal Income Tax Returns
In April 1975, Revenue Agent Gerald Pierce (Pierce) was assigned to examine petitioner's Federal income tax returns for 1972 and 1973. Before contacting petitioner, Pierce prepared a rough preliminary analysis *460 of petitioner's income tax returns for the years at issue which indicated that petitioner "was having more money going out than coming in." At his first meeting on April 17, 1975 with petitioner and Bourgeois, petitioner's accountant, Pierce perpared an interview worksheet in which he compiled general information about the taxpayer. Petitioner described for Pierce his bookkeeping method, listed his bank accounts, identified various properties which he owned and the mortgages on those properties. Pierce asked petitioner how much cash he had on hand at the beginning of 1972 including "money in your pocket, in your cash register and also in your home or anyplace." Petitioner responded that he had $3,000 cash on hand; that he tried to maintain a $3,000 balance for the business. [2] Petitioner also informed Pierce that he had no nontaxable sources of income for the years at issue such as inheritances, gifts, or social security benefits. At this first meeting, Pierce reconciled petitioner's 1972 and 1973 income tax returns with his books and found no discrepancies. *461 After his first meeting with petitioner, Pierce prepared a rough bank deposit schedule reflecting deposits made by petitioner into his checking accounts at the Bank of Louisiana and the National American Bank. The rough analysis showed that petitioner's total bank deposits exceeded what petitioner had reported on his returns as receipts from the Golden Coin and his rental property. When Pierce asked petitioner for an explanation of this discrepancy at his second meeting with petitioner on May 9, 1975, petitioner gave no oral response and offered no explanation. On July 9, 1975, Pierce met again with petitioner and presented him with a more refined and expanded bank deposit analysis which for 1972 showed deposits in excess of $15,900 over gross receipt figures reported by petitioner on his 1972 return. Petitioner once again offered no response or comment to Pierce's request for an explanation of this discrepancy. Pierce asked petitioner at this meeting whether he had available to him cash from other years which he may have deposited during the years at issue. Petitioner informed Pierce that he had a safe at home where he would have kept this money; there was no written record *462 of how much money was in the safe; that he was the only one ever to count the money; neither his wife nor his children were aware of how much money was in the safe; and he could not remember how much money there would have been in the safe at any given time. Pierce also questioned petitioner again with respect to petitioner's cash on hand at the beginning of 1972. Petitioner informed Pierce that he had $2,000 cash on hand, but later on during the meeting, petitioner increased that figure to $10,000. Upon referral by Pierce, petitioner's case was evaluated and accepted by the Criminal Investigation Division of the Internal Revenue Service (IRS). The investigation of petitioner's 1972, 1973 and 1974 taxable years was assigned to Special Agent Kelly Daigle (Daigle). On October 23, 1975, Daigle interviewed petitioner and they discussed, among other things relevant to his business and financial affairs during the years under investigation, petitioner's safe. Daigle asked petitioner how much money was in the safe; however, petitioner, on advice of his attorney, would not say how much money was in the safe at that, or any other, time. At the same meeting, Daigle also questioned *463 petitioner with respect to depreciation deductions which had been taken on certain restaurant equipment purchased in 1972, held for only a few days, and then sold. Daigle asked petitioner why depreciation was taken on the equipment for both 1972 and 1973 after it had been sold. Petitioner informed Daigle that he had failed to inform his accountant, Bourgeois, about the sale of the equipment. On November 13, 1975, at the request of petitioner's attorney, Daigle met with petitioner and his family at petitioner's home in order to observe petitioner's style of living and to inspect the safe which petitioner kept in his house. Daigle asked petitioner questions with respect to the year-end balances contained in the safe. Petitioner informed Daigle that he had no idea what the year-end balances were and that he couldn't venture a guess as to what they might have been; he explained that it was his habit to put money into the safe without counting it. Daigle "repeatedly asked questions trying to nail down a year-end balance of cash available." In response, petitioner "repeatedly stated that he didn't count the money and that the couldn't say what the year-end balances were." Petitioner *464 later told Daigle at this same meeting that on April 6, 1972, he opened the safe, counted the money and discovered that there was between $40,000 and $44,000 in the safe. He stated that he did so in the presence of his son, Thomas J. Catalanotto, Jr. (Thomas Jr.), who was born in 1958 and was then 14 years old, and his son knew the combination of the safe. He stated that he withdrew $19,000 from the safe, placed the money in a brown paper bag, and opened a passbook savings account at the Homestead Savings Association. [3] Further, he stated that he had begun saving money approximately 15 years prior to the time of the interview, since 1961, when he sold certain property on St. Peters Street, and the first time he had ever withdrawn money from the safe was on April 6, 1972.From that date on, he had never put any money back into the safe; he always withdrew funds. With respect to the source *465 of his savings, petitioner told Daigle that it was money he had saved from his business over the years. Daigle informed petitioner that, based on the income reported on his tax returns since 1954 and a tentative anaysis of funds available to save prepared by Pierce, he didn't think petitioner could have saved that much money over the years. Petitioner, however, at this point, insisted that he had begun saving money from his business since 1954 when he bought the safe. [4]
4. Reconstruction of Petitioner's Income
Because of both the discrepancy found by Pierce between income reported by petitioner on his 1972 and 1973 tax returns and bank deposits which exceeded those amounts, and petitioner's failure to provide substantiation of his gross receipts for the Golden Coin, respondent reconstructed petitioner's income using the net worth plus personal expenditures method (net worth method). Based on this reconstruction, *466 respondent determined that petitioner underreported his taxable income by $19,690.71 for 1972 and by $35,975.29 for 1973. Respondent's net worth computation is as follows: Net Worth Computation
Taxable Years Ended December 31, 1972 and December 31, 1973 Assets
12/31/71
12/31/72
12/31/73
Cash on hand
$ 3,633.80
$ 3,000.00
$ 3,000.00 Cash in banks
25,239.21
27,179.96
38,901.05 Loans receivable
500.00 Merchandise inventory
500.00
500.00
1,500.00 Furniture & Fixtures
18,124.96
27,899.69
30,194.47 Real estate
246,857.29
278,040.14
278,040.14 Total Assets
$294,355.26
$336,619.79
$352,135.66 Liabilities
Notes payable
$ 6,701.64
$ 3,033.53 Mortgages payable
105,024.72
122,611.30
115,916.49 Reserve for depreciation
42,448.97
50,904.92
59,459.06 Total Labilities
$147,473.69
$180,217.86
$178,409.08 Net Worth - ending
$146,881.57
$156,401.93
$173,726.58 Net Worth - beginning
146,881.57
156,401.93 Increase in New Worth
$ 9,520.36
$ 17,324.65 Adjustments to Net Worth
(Personal expenditures)
21,432.27
24,617.18 Adjusted Gross Income as
Corrected
$ 30,952.63
$ 41,941.83 Less: Deductions
6,711.40
7,019.92 Taxable Income as Corrected
$ 24,241.23
$ 34,921.91 Taxable Income per Return
4,550.52
(1,053.38)
Understatement of
$ 19,690.71
$ 35,975.29 Taxable Income
*467 5. Financial History of Petitioner
In response to petitioner's contention that the excess bank deposits made during the years at issue came from savings derived from former years' business income, respondent prepared an 18-year analysis, covering the years 1954 - 1971, of funds which would have been available for petitioner to save. This analysis, set forth below, showed a deficit of $73,087.08 between funds available for petitioner to save and founds expended by petitioner during the 18-year period. Funds Available to Save
Available Funds
1954-1971
Reported net income, plus depreciation
(1954-1971)
$ 201,193.29 Federal tax refund
44.97 Savings withdrawals (1954-1971)
7,649.55 Loan proceeds available (1958)
2,926.54 Asset sale - 1513 St. Peter (1961)
8,528.87 Total Available
$ 220,343.22 Use of Funds
1954-1971 Federal tax & self-employment (1954-1971)
$ 21,606.03 Mortgage repayments (1954-1971)
98,029.64 Saving deposits (1954-1971)
50,925.00 Loan repayment - Bank of Louisiana
24,120.00 Loan repayment - TAC Amusement
7,735.00 Furniture & Fixtures (business)
(1954-1971)
35,827.54 Capital improvements (1954-1971)
587.09 Personal living expenses (1954-1971)
40,600.00 Purchase - 1513 St. Peter (1956)
8,500.00 Downpayment - 6356 Marshall Foch (1967)
4,500.00 Downpayment - Pontchartrain Gardens
1,000.00 Total Use of Funds
$ 293,430.30 Recap: Total Available
$ 220,343.22 Less: Total Use
(293,430.30)
Available to Save
$ ( 73,087.08)
*468 Respondent determined that petitioner held funds in bank accounts, engaged in property transactions beginning in 1956, and was involved in loan transactions geginning in 1953 as set forth in the following schedules: Schedule of Bank Accounts
Balance
Balance
Balance
Accounts
12/31/71
12/31/72
12/31/73
A. Checking
Bank of Louisiana
(Acct. #170461)
$ 696.28
$ 452.60
$ 949.29
National American
Bank (Acct. #
03-34-416-5)
1,056.58
1,590.76
1,366.19
Subtotal-Checking
$ 1,752.86
$ 2,043.36
$ 2,315.48
B. Savings
National American
Bank (Acct. #3933, CD)
10,000.00
National American
Bank (Acct. #
0309954-4)
885.33
925.62
970.32
National American
Bank (Acct. #
0311388-0)
50.00
50.00
National American
Bank (Acct. #
0307449-1)
1,303.07
Jefferson Savings
(Acct. # 1-012214)
17,170.49
Homestead Savings
(Acct. # 58-601596)
19,874.46
21,103.33
Homestead Savings
(Acct. # 61-1205)
4,077.46
4,286.52
4,511.92
Subtotal-Savings
$23,486.35
$25,136.60
$36,585.57
Subtotal-Checking
1,752.86
2,043.36
2,315.48
Subtotal-Cash in Banks
$25,239.21
$27,179.96
$38,901.05
Schedule of Property Transactions
Item
Purchase Date
Total Cost
Downpayment
Financed
6409/11 Marshall
1953
$ 25,000
$5,900
$ 1,800
Foch
17,305 [1]
1513 St. Peter
1956
$ 8,500
$8,500
400 N. Galvez
1958
$ 80,000
$45,200 (Pet's
retained $2,926.54)
$ 7,776
$30,229 (condem-
nation proceeds) [2]
Pontchartrain
Garden
Lot
1962
$ 2,300
$1,000
$1,300
6356 Marchall
1967
$ 14,500
$4,500
$7,735 to $10,000 [3]
Foch
real estate
purchase
Home
1972
$ 27,720
$5,695
$23,000
Construction
3655 18th St.
1968
$ 35,000
$4,270
$69,952
real
estate purchase
Building
1968
$107,556
$29,170
Furniture and
1968
$ 15,000
$25,000
Fixtures
$27,664
$ 4,000 [4]
*469 Schedule of Loan Transactions
Year
Item
Borrowed
Amount
Description
Loan 1310
1953
$17,305.54
Mortgage assumed
upon purchase of
6409/11 Marshall
Foch; repaid with
proceeds of Loan
4144.
Second Mortgage on
6409/11 Marsh. Foch
1953
1,800.00
Loan 4144
1958
22,050.00
Proceeds used to
satisfy Loan 1310;
balance applied to
purchase of 400
N. Galvez.
Loan 4145
1958
41,400.00
Proceeds for use
on purchase of 400 N.
Galvez. Repaid with
proceeds of Loan
4331.
Loan 4331
1958
45,200.00
Proceeds used to
satisfy Loan 4145.
Balance of $2,926.54
received by
petitioners. Loan
paid off with
proceeds from sale
of furniture and
fixtures of Green
Room in 1967.
TAC Amusement
1967
7,735.00
Stipulation established
the amount
of the loan, though
Catalanotto had
stated it was for $10,000.
Proceeds used in purchase
of real
estate at 6356 Marshall
Foch.
Bank of La. Loan
1968
25,000.00
Proceeds of loan used
towards
purchase and construction of
3655 18th St.
Loan 11882
1968
77,000.00
Proceeds of loan used
towards purchase
and construction of 3655 18th St.
Mortgage given on 3655 18th St.
Loan 11883
1968
30,000.00
Proceeds of loan used
towards purchase
and construction of 3655 18th St.
Mortgage given on 400 N. Galvez.
Loan 351
1972
23,000.00
Proceeds used to finance
construction
of home at 6356 Marshall Foch.
Loan 05-110-8839
1972
1,500.00
Proceeds of this Bank
of New Orleans
loan used to purchase
air-conditioner.
*470 Not listed above are several financing arrangements with Credit Thrift; this financing was entered by petitioner in purchase of automobiles. OPINION 1. The Deficiencies
The first issue for consideration is whether petitioner underreported his taxable income by $19,690.71 in 1972 and $35,975.29 in 1973 resulting in the deficiencies in his Federal income tax as determined by respondent using the net worth method of income reconstruction. After careful consideration of the facts of record, we sustain respondent's deficiency determination. [5]
*471 We find, at the outset, that respondent's use of the net worth method in reconstructing petitioner's income was fully justified in the present case. Respondent's agents uncovered substantial disparities between petitioner's reported taxable income for the years at issue and bank deposits made by him during those years for which petitioner gave no satisfactory explanation. Further, even though on examination, petitioner's books and records reflected no inconsistencies with his tax returns for the years at issue, respondent was justified in questioning the reliability of petitioner's books and records. See Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). The Golden Coin was strictly a cash business. It was petitioner himself who entered the Golden Coin's daily gross cash receipts onto the recap sheets with he provided to Accurate Accounting. The gross receipt figures appearing on petitioner's income tax returns were based on these recap sheets prepared by petitioner. Thus, petitioner alone was the source of all information set forth on his Federal income tax returns. Yet, petitioner did not retain the cash *472 register tapes and sales receipts generated daily at the Golden Coin, the only documentation which would have substantiated the reliability of the gross cash receipts set forth by petitioner on the recap sheets. See Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court. Given the marked discrepancies between bank deposits and reported income found by respondent, and petitioner's admitted failure to retain substantiating evidence, we find that respondent reasonably concluded that petitioner's records did not accurately reflect his income, and, therefore, that respondent was justified in reconstructing petitioner's income using the net worth method. See Merritt v. Commissioner,301 F.2d 484, 486 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. In a case such as this, where the determination of unreported income as well as the existence of fraud necessary to lift the bar of the statute of limitations (Part 2 of this Opinion) depends upon respondent's net worth computation, we must examine the *473 validity of respondent's computation in light of the standards set forth by the Supreme Court in Holland v. United States,348 U.S. 121, 129 (1954) and United States v. Massei,355 U.S. 595 (1958). Under those standards, respondent must first establish, with reasonable certainty, an opening net worth. Further, he must establish either that a likely source of unreported income existed, or that he conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. For the reasons stated below, we conclude that respondent's net worth computation fully complies with the standards of Holland and Massei.
A.Opening Net Worth/Cash on Hand
As set forth in our Findings of Fact, respondent determined that as of December 31, 1971, petitioner's net worth was $146,881.57, which included cash on hand of $3,633.80. [6] The only item in respondent's net worth computation challenged by petitioner is the amount of petitioner's cash on hand. Petitioner contends that as of December 31, 1971, he kept, in a safe in his bedroom, a cash hoard well in excess of $3,633.80 consisting of money he had saved from his business *474 over the years. He maintains that it was this cash which was the source of his excess bank deposits and resultant net worth increase for the years at issue. Thus, contends petitioner, because respondent has grossly understated his cash on hand, respondent has not established petitioner's opening net worth with reasonable certainty. We conclude that petitioner's evidence of the existence and the amount of this alleged cash hoard is wholly deficient and that respondent has convincingly proven, that his determination of petitioner's opening net worth is accurate. At no time has petitioner actually stated an exact amount which he contends was contained in his safe as a cash hoard at the beginning of the net worth computation period. Further, petitioner has not demonstrated any specific use of the cash hoard funds during *475 the years at issue, either in purchasing assets or in making bank deposits, which would have affected the net worth computation. At various occasions during both the audit and the criminal investigation covering the years at issue, petitioner informed respondent's agents that he had cash on hand in such widely varying estimated amounts as $3,000, $2,000, $10,000 and between $40,000 and $44,000. Petitioner even stated on one occasion that he kept money in a safe at home, but he never counted it and he had no idea how much money was in the safe. Such contradictory statements by petitioner in no way establish the existence or amount of a substantial cash hoard. Rather, the statements are evidence of an attempt to mislead the investigating agents. Indeed, petitioner's own attempt during the audit period to illustrate the existence of a cash hoard is inconsistent with the facts of record. Petitioner told Revenue Agent Pierce that, on April 6, 1972, he opened his safe, withdrew $19,000 in cash, carried the funds to the Homestead Savings Bank in a brown paper bag and opened an account there. Petitioner did in fact purchase a certificate of deposit from the Homestead Savings Association *476 in the amount of $19,000 in April 1972; however, funds in the amount of $17,000 used toward the purchase of this CD were withdrawn by petitioner from his personal bank account at the Jefferson Savings and Loan Association. Only $2,000 of the funds used to purchase the CD was in the form of cash. Here, again, petitioner sought to mislead the investigating agent. Petitioner stresses on brief that during the years at issue, he systematically deposited, in amounts ranging from $500 to $5,000, a total of $43,830 in cash into his bank account at the National American Bank. Petitioner would have us conclude, from the mere fact that such deposits were made, that the source of these deposits could only have been a cash hoard. We are unable to make such a quantum conclusory leap in the absence of any other evidence in the record which would support a finding that the source of such deposits was a cash hoard. The source of such cash deposits could have easily been petitioner's rental receipts or unrecorded cash receipts from his cash business, the Golden Coin, as from a cash hoard.Thus, we do not find such cash deposits persuasive evidence of a cash hoard. To further support his cash *477 hoard claim, petitioner places major emphasis on the trial testimony of his son, Thomas, Jr. who testified that in 1968 or 1969, his father told him the combination to the safe in his father's bedroom closet and showed him how to open the safe. On that occasion, Thomas, Jr., claimed that he helped his father court the money in the safe which totalled between $35,000 and $40,000 in various denominations of cash. He further testified that in later years, including 1972 and 1973, the years at issue, he would enter the safe at his father's request and take cash, varying in amounts from $200 to $500, which he would then carry on foot and deposit into his father's checking account at the National American Bank to cover his father's business expenses. We find it difficult to believe that petitioner, described in the testimony as an astute businessman, would have entrusted to a child of 10 or 11 years of age the task of counting $35,000 to $40,000 in cash. Also, given the extensive evidence indicating that petitioner alone handled all aspects of his business, it is inconceivable that he would have allowed a 14-year-old youth to carry, unaccompanied, such large amounts of cash on foot for *478 deposit. Further, we find the testimony of Thomas, Jr., itself to be unconvincing. It is internally inconsistent and it is inconsistent with both statements made by petitioner to the revenue agents during the course of the audit and certain other documentary evidence. Thomas, Jr., testified on direct examination that he learned the combination to the safe in 1968 or 1969 when he was 10 or 11 years old. Later, on cross-examination, he stated that he learned the combination when he began working at the Golden Coin when he was 15 or 16 which would have occurred in 1973 or 1974, well past the December 31, 1971 date from which respondent calculated petitioner's opening net worth. On direct examination, Thomas, Jr., stated that he made deposits into his father's account at the National American Bank, and he wasn't aware of any account maintained by his father at the Bank of Louisiana. Later, on cross-examination, however, he stated that he deposited money for his father at "the Bank of Louisiana -- the Bank of New Orleans, National American Bank." These internal inconsistencies alone clearly demonstrate Thomas, Jr.'s lack of credibility. In addition, Thomas, Jr.'s testimony is inconsistent *479 with statements made by petitioner himself. Petitioner told Revenue Agent Pierce in 1975 that he was the only one ever to have counted the money contained in the safe and that neither his wife nor his children knew how much money was in the safe. He even stated at that time that he himself did not know how much money was actually in the safe. Although later, petitioner altered his story and stated that in 1972 he opened the safe in the presence of his son and withdrew $19,000 to open a bank account at Homestead Savings Association, petitioner's statements are inconsistent with Thomas, Jr.'s testimony that he helped his father count the money in 1968 or 1969. The documentary evidence points up the inaccuracy of Thomas, Jr.'s testimony as well. Petitioner presented in evidence a schedule of bank deposits made into the two checking accounts maintained by him at the the National American Bank and the Bank of Louisiana. Petitioner stated and both parties agreed that all business expenses were paid through the Bank of Louisiana account. An examination of deposits made into the Bank of Louisiana account corroborates petitioner's statement that he made regular, once-weekly deposits *480 into this account to cover business expenses. Thus, Thomas, Jr.'s testimony that he deposited amounts ranging from $200 to $500 into the National American Bank at his father's request to cover business expenses is inconsistent with petitioner's own exhibit. Further, the schedule indicates only two deposits of cash into the National American Bank account during 1972 and 1973 in amounts of $500 or less. We conclude, based on all of the foregoing, that Thomas, Jr.'s testimony is unworthy of belief. In contrast to petitioner's vague and inconsistent claims with respect to a cash hoard, we think the evidence produced by respondent demonstrates that petitioner's cash on hand as of December 31, 1971 was no more than that credited to him by respondent in the net worth computation. During the initial interview, Revenue Agent Pierce asked petitioner how much cash he had in his pocket, in his cash register, and at home. Petitioner's response was that he tried to maintain a $3,000 balance for his business and that he maintained that amount through either the end of 1972 or 1973. This $3,000 figure is also supported by the balance sheet for the Golden Coin maintained by Accurate Accounting *481 Service and is more favorable to petitioner than an earlier statement made by petitioner to a bank in connection with a loan that as of December 31, 1967, his cash on hand was $1,200. In the circumstances, we think that respondent acted reasonably in relying on petitioner's initial response with respect to cash on hand at the time of the first interview rather than on statements made at a later time. The later statements were made after petitioner had time to consult with his tax advisors, and he may have learned that he should have given the revenue agent a higher estimate in order to protect himself in the face of a possible criminal fraud charge. This conclusion is borne out by petitioner's later widely inconsistent statements in which he maintained that he had cash on hand in amounts varying anywhere from $2,000 to $44,000. In addition to his reliance on petitioner's own statement with respect to his cash on hand, respondent also compiled substantial affirmative evidence which convincingly refutes petitioner's claim of the existence of a cash hoard. As noted in our Findings of Fact, respondent prepared, based on information supplied by petitioner, an 18-year analysis of *482 funds available to save which, in our view, negates the possibility that petitioner was able to save as much as $40,000 by December 31, 1971. Further, the record contains no credible explanation of why petitioner would keep a large cash hoard. The schedule of bank accounts maintained by petitioner and the schedules of property transactions and borrowings engaged in by petitioner show him to have been a person who invested extensively in property and who was not mistrustful of banks. Indeed, he placed substantial sums of money in interest-bearing accounts and borrowed substantial sums at market interest rates to finance his real estate activity. In sum, respondent has, by his affirmative evidence, refuted petitioner's claim of a cash hoard and has demonstrated, clearly and convincingly that petitioner's cash on hand as of December 31, 1971 was not more than the $3,633.80, with which he was credited in respondent's computation. B. Likely Source of Unreported Income/Negation of Non-Taxable Sources of Income
Petitioner also maintains that respondent has failed to present evidence which would support the inference that petitioner's net worth increases are attributable to currently *483 taxable income. Petitioner argues that respondent has failed both to demonstrate a likely source of unreported income and to conduct a thorough investigation in order to negate all possible sources of nontaxable income. We note that respondent is not required to do both. In Holland v. United States,348 U.S. 121 (1954), the Supreme Court held that proof of a likely source is required in a net worth case; however, later in United States v. Massei,355 U.S. 595 (1958), the Supreme Court held that if all possible sources of nontaxable income are negated, there is no necessity for proof of a likely source. Thus, respondent must do one or the other. Nonetheless, based on the evidence produced by respondent, we conclude that he has satisfied both of these alternative methods of establishing that the increases in petitioner's net worth are the result of unreported taxable income. Respondent points to the Golden Coin, a cash business controlled exclusively by petitioner, as the likely source of unreported income. Petitioners have attempted to paint the Golden *484 Coin as a money-losing operation which could not have produced the amounts of income determined by respondent to have been unreported by petitioner. We do not agree. Nothing, other than unsupported suggestions by petitioner's counsel during cross-examination of several witnesses and on brief and inadmissible declarations by petitioner's accountant, indicates that the Golden Coin was not profitable. [7]
*485 With respect to its profitability, the most that any of the Golden Coin's former employees who testified at trial could say was that it was not a big moneymaker; however, a former bartender testified that the Golden Coin's receipts averaged $100 per shift on weekdays and $500 per shift on weekends. Even assuming the Golden Coin operated on the basis of one shift per night, such receipts would total according to this conservative estimate, some $72,000 annually as opposed to the approximately $39,000 reported by petitioner on each of his returns for 1972 and 1973. [8] Thus, we conclude that the Golden Coin was a likely source of unreported taxable income. We are also satisfied that respondent conducted a thorough investigation to negate all sources of nontaxable income.Respondent identified all loans and mortgages as far back as 1952 and traced the proceeds of these borrowed funds. All unpaid loans were noted as liabilities on the net worth computation. Respondent's agents questioned both petitioner and his wife as to gifts, inheritances, social security *486 benefits or any other form of nontaxable income which they might have received. At no time did they identify any such sources. Both denied that they had received any type of nontaxable income. The only lead provided by petitioner was his claim of a cash hoard which respondent's agents thoroughly investigated and convincingly negated as stated in our discussion above. Respondent is not required to go on a "Magellan-like expedition" in exploring sources of nontaxable income. United States v. Hiett,581 F.2d 1199, 1201 (5th Cir. 1978). We are convinced that his investigation was thorough and that petitioners received no nontaxable income which could have accounted for the increases in net worth. 2. Additions to Tax
The second issue for consideration is whether any part of any underpayment of taxes resulting from petitioner's underreporting of income for 1972 and 1973 was due to fraud. With respect to this issue, respondent bears the burden of proving fraud by clear and *487 convincing evidence. Sec. 7454(a); Rule 142(b). Fraud, for purposes of section 6653(b), has been defined as an intentional wrongdoing with the specific intent to evade a tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Powell v. Grandquist,252 F.2d 56, 60 (9th Cir. 1958); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court.After considering all of the evidence, we think it is clear that petitioner has engaged in a course of conduct quite obviously intended to conceal his taxable income and, therefore, he is liable for the additions to tax for fraud for both years at issue. Not only did petitioner grossly understate his taxable income for the 2 years at issue, i.e., we have determined above that his taxable income was more than 5 times that reported on his returns, but he also disposed of the Golden Coin's cash register tapes and guest receipts, the only evidence available which would have substantiated his cash receipts. To destroy the only records that *488 would have permitted direct verification of his cash receipts and then to rely upon a pre-existing cash hoard to explain excessive net worth increases would, if accepted, provide a formula for fraud with impunity. [9]
*489 On brief, petitioner claims that he was never instructed to retain the cash register tapes; however, Bourgeois, petitioner's accountant admitted that he instructed petitioner to retain the tapes. Petitioner also contends that he disposed of the tapes routinely because small cash businesses such as the Golden Coin ordinarily do not retain cash register tapes, citing in support of this claim the trial testimony of Buddy Bloecher, an employee of Accurate Accounting who prepared petitioner's tax returns for the years at issue. Bloecher admitted, however, that he had very little experience with bag accounts.We do not find his testimony persuasive with respect to small cash business practice. We find that petitioner's disposal of the tapes and receipts was more than merely routine; we think he disposed of them with the intention of concealing the amount of his cash receipts. Petitioner's plea of guilty to the criminal charge under section 7203 of failure to keep adequate books and records, i.e., the cash register tapes for 1972, is an admission that he did so willfully. His subsequent reliance on the existence of a cash hoard, which was not documented in any way, to explain his net *490 worth increases, convinces us that he deliberately destroyed the tapes and receipts in order to conceal his income. Further evidence of petitioner's intent to conceal his income may be found in a series of misleading statements which he made to respondent's agents during the course of the audit and criminal investigation. On April 17, 1975, he stated that he had cash on hand of $3,000. On July 9, 1975, he stated that he had a safe at home, that he was the only one who knew the combination and that he had no idea how much money was in the safe.On the same date, he gave cash on hand figures of $2,000 and then $10,000. On November 13, 1975 petitioner claimed to have had $40,000 - $44,000 in the safe and that on April 6, 1972, he took $19,000 in cash to open a bank account.Not only are such inconsistent statements misleading in and of themselves, as discussed above, petitioner's bank account story has been shown by respondent to be false. Thus, we can only conclude that these statements were intended by petitioner to mislead the investigating agents and to conceal his income from them during the investigation. We think it quite clear that notwithstanding his lack of formal education, *491 petitioner, who had been in the bar business since 1947, who invested in and maintained substantial rental property, was a strict, astute businessman. He alone held tight rein over all aspects of his business affairs. He fully recognized that by conducting a cash business, recording his cash receipts on recap sheets, and then destroying any substantiating evidence, he could conceal large amounts of income. We find that he did in fact do so and, therefore, he is liable for the additions to tax for fraud. [10]
Based on the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All "Rules" references are to the Tax Court Rules of Practice and Procedure.↩
2. In connection with a loan application, petitioner submitted a net worth statement as of Dec. 31, 1967 to the First Homestead and Savings Association in which he identified cash on hand in the amount of $1,200.↩
3. On Apr. 4, 1972, petitioner purchased a $19,000 certificate of deposit (CD) bearing 6-percent interest from the Homestead Savings Association. He purchased the CD with $2,000 cash and $17,000 which he had withdrawn from his savings account at the Jefferson Savings and Loan Association.↩
4. In spite of the statement that he had been saving money since 1954, during 1964, petitioner advised the City of New Orleans that because of financial difficulties he was experiencing, he was unable to pay some $440.00 in property taxes due to the City.↩
1. The financing for 6409/11 Marshall Foch was in the form of an assumed loan in the amount of $17,305, Loan #1310, and a second mortgage for $1,800. ↩
2. Property acquired in 1952 was condemned in 1958; condemnation proceeds, which approximated $32,000, used towards purchase of 400 N. Galvez. ↩
3. The parties have stipulated the loan was in the amount of $7,735, however, Thomas Catalanotto had stated the loan was for $10,000. ↩
4. Proceeds from sale of Pontchartrain Gardens lot.↩
5. Petitioner contends that the 3-year statute of limitations precludes respondent's assessment and collection of the deficiencies he has determined. In view of our holding in this Part and in Part 2 of our opinion, that a part of petitioner's underpayment of tax was due to fraud within the meaning of sec. 6653(b), the fraudulent return exception to the statute of limitations provided in sec. 6501(c)(1) applies so that the tax may be assessed "at any time." Stone v. Commissioner,56 T.C. 213, 227-228↩ (1971). Because of our finding of fraud, we do not consider the effect of sec. 6501(e)(1)(A) on the timeliness of the notice of deficiency.
6. Although somewhat in excess of petitioner's statement that he retained $3,000 cash on hand for the business, this figure was used by respondent to take into consideration any undeposited business receipts from the last week of 1971 which petitioner may have been keeping in his bedroom drawer pursuant to his practice of making business deposits each Monday.↩
7. Statements made by petitioner's counsel under these circumstances obviously do not constitute evidence. Petitioner contends that recorded statements made by petitioner's accountant, Bourgeois, who is now deceased, in a question and answer session with Special Agent Daigle should be admissible. These statements, concededly hearsay, are not admissible under Rule 804(b)(5) of the Federal Rules of Evidence, the "catch all" exception to the hearsay rule.We so hold because we do not think that Bourgeois' statements, even though made under oath, possess "equivalent circumstantial guarantees of trustworthiness" to the other hearsay exceptions. We agree with respondent that Bourgeois' obvious bias and the lack of any cross-examination opportunity render such statements untrustworthy. See Estate of Temple v. Commissioner,65 T.C. 776, 781↩ (1976). We add that even if Bourgeois' statements, which we have examined with some care and found to be cast only in general terms, were in evidence, they would not alter our findings.
8. This figure is reached by multiplying 4 nights by $100 times 52 weeks, and adding 2 nights by $500 times 52 weeks.↩
9. The facts here are analogous to Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court, where the taxpayer disposed of original records, and the court said: * * * the books involved here contained items of net income with hospital expenses already deducted. The disposal by the taxpayer of bills evidencing these expenses made the computation of their amount impossible, and thus left vague and unreported some unknown amount of income. The taxpayer's practice of cashing checks representing his patients' fees and receiving the money in large denominations rather than depositing the checks themselves made it impossible to test the accuracy of the books from that source. If taxpayer's contention is correct, everyone could keep a set of apparently accurate books, carefully destroy other evidences of the source and amount of income, and defend by an alien rule that the net worth method may not be used in those circumstances--and thus the government could be defrauded with impunity.However, it is when other methods of disclosing income fail that the net worth computation becomes especially important in the collection of revenue.↩
10. For the same reasons, the notice of deficiency was timely under sec. 6501(c)(1).↩